Argued and submitted December 4, 2020, affirmed June 23, petition for review allowed August 2, 2021 (368 Or 510)
See later issue Oregon Reports

In the Matter of R. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. O. B.,
aka M. B.,
*Appellant.*

Washington County Circuit Court
19JU08898; A174276

493 P3d 553

Father appeals a judgment of jurisdiction and disposition regarding his infant son, R. On appeal, father argues that the juvenile court exceeded its authority under ORS 419B.387 when it ordered father to participate in a psychological evaluation. *Held*: The juvenile court did not err. Legally sufficient evidence supported the juvenile court's determination that a psychological evaluation was a component of the treatment or training needed by father to prepare father to resume care of R. Thus, the juvenile court did not exceed its authority under ORS 419B.387.

Affirmed.

En Banc

Kathleen J. Proctor, Judge.

Tiffany Keast, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Jon Zunkel-deCoursey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Egan, Chief Judge, and Armstrong, Ortega, DeVore, Lagesen, Tookey, DeHoog, Shorr, James, Aoyagi, Powers, Mooney, and Kamins, Judges.

TOOKEY, J.

Affirmed.

Tookey, J., filed the opinion of the court in which Egan, C. J., and Armstrong, DeVore, Shorr, Powers, and Kamins, JJ., joined.

Aoyagi, J., dissented and filed an opinion in which Ortega, Lagesen, DeHoog, James, and Mooney, JJ., joined.

**TOOKEY, J.**

In this juvenile dependency case, father appeals a juvenile court judgment establishing dependency jurisdiction over his infant son, R, and ordering father to participate in a psychological evaluation. On appeal, father argues, among other points, that the juvenile court exceeded its authority under ORS 419B.387 when it ordered father to participate in a psychological evaluation. We conclude that legally sufficient evidence supports the juvenile court's determination that a psychological evaluation was a component of the treatment or training needed by father to prepare father to resume care of R, and, thus, the juvenile court did not exceed its authority under ORS 419B.387.[1] Accordingly, we affirm.

When analyzing an order under ORS 419B.387, we "review the juvenile court's legal conclusions for errors of law and its findings for any evidence." *Dept. of Human Services v. D. R. D.*, 298 Or App 788, 791, 450 P3d 1022 (2019) (internal quotation marks omitted).

ORS 419B.387 provides:

"If the court finds in an evidentiary hearing that treatment or training is needed by a parent to correct the circumstances that resulted in wardship or to prepare the

---

[1] There are two statutes under which a juvenile court may order a parent to participate in a psychological evaluation in connection with a dependency case: ORS 419B.387 and ORS 419B.337(2). *Dept. of Human Services v. L. J. W.*, 302 Or App 126, 130, 460 P3d 540, *rev den*, 367 Or 75 (2020).

In this case, the juvenile court did not expressly identify whether it was relying on its authority under ORS 419B.387 or ORS 419B.337(2) when it ordered father to participate in a psychological evaluation. The Department of Human Services, however, argues that from the context of the juvenile court's ruling, we should understand the juvenile court to have relied on ORS 419B.387, rather than ORS 419B.337(2). We agree. Therefore, in this opinion, we consider whether, on this record, the juvenile court was authorized to order father to participate in a psychological evaluation under ORS 419B.387.

On appeal, father argues that our case law concluding that ORS 419B.337(2) authorizes a juvenile court to order a psychological evaluation is "plainly wrong" and should be overruled. Because we understand the juvenile court to have made its order based on ORS 419B.387, we do not address father's argument. *Dept. of Human Services v. D. R. D.*, 298 Or App 788, 796 n 3, 450 P3d 1022 (2019) (declining to address argument that case law concerning ORS 419B.337(2) is plainly wrong and should be overruled where the juvenile court "acted pursuant to ORS 419B.387, and not ORS 419B.337(2)").

parent to resume the care of the ward, the court may order the parent to participate in the treatment or training if the participation is in the ward's best interests."

ORS 419B.387, "by its terms, governs orders for treatment and training for remedial purposes (to correct the circumstances that resulted in wardship) in the context of reunification efforts (to prepare the parent to resume care)." *Dept. of Human Services v. P. W.*, 302 Or App 355, 359, 460 P3d 1044 (2020).

The text of ORS 419B.387 reflects that a juvenile court's authority to order a psychological evaluation under ORS 419B.387 is not unbounded; it is, instead, cabined and requires that a juvenile court make certain predicate determinations before ordering a psychological evaluation under ORS 419B.387. *See generally D. R. D.*, 298 Or App at 796-99. In *D. R. D.*, after reviewing the text of ORS 419B.387 in context, we explained that ORS 419B.387, "on its face, clearly conditions a juvenile court's authority to order a parent or guardian to participate in treatment or training upon an 'evidentiary hearing' at which point evidence must establish, to the juvenile court's satisfaction, that such treatment or training is 'needed,'" and that a "psychological evaluation—*as a component of treatment or training*—is authorized under ORS 419B.387." *Id.* at 799 (emphasis in original). We also explained that ORS 419B.387 does not authorize "the juvenile court to order a parent's compliance with a psychological evaluation to determine if treatment or training is needed in the first instance" and does not "imbue the juvenile court with authority to order a parent to comply with a discovery mechanism to determine *if* there is a need for treatment or training." *Id.* (emphasis in original). Instead, under ORS 419B.387, "it is the establishment of a need for treatment or training at the evidentiary hearing that then creates the court's authority to order a parent to comply with that treatment or training." *Id.* at 799-800. *See also Dept. of Human Services v. L. J. W.*, 302 Or App 126, 132, 460 P3d 540, *rev den*, 367 Or 75 (2020) (ORS 419B.387 "requires a showing of a need for the examination for treatment or training directed toward reunification"); *P. W.*, 302 Or App at 359 (noting that, in *D. R. D.*, we held "that ORS 419B.387 authorizes the juvenile court to order a parent

to submit to a psychological evaluation, but only after the establishment of a need for treatment or training at the evidentiary hearing" (internal quotation marks omitted)).

Thus, ORS 419B.387 does not authorize a juvenile court to order that a parent participate in a psychological evaluation in every dependency proceeding; a predicate determination of "need" is essential before a court can order a psychological evaluation under ORS 419B.387.

On appeal, father argues that the juvenile court "ordered father to submit to a psychological evaluation as an effort to determine if father needed 'treatment or training,'" and, "as such, the order is foreclosed by *D. R. D.*'s prohibition on ordering a parent to comply with a discovery mechanism to determine if there is a need for treatment or training." The state, for its part, argues that, the record in this case, "like those in *D. R. D.* and [*Dept. of Human Services v. T. L. H.*, 300 Or App 606, 453 P3d 556 (2019),] was sufficient to establish that father needed to participate in a psychological evaluation based on his admitted need for services, his history of domestic violence, and his need to address his aggressiveness and impulsivity."[2]

Given the parties' arguments, we note that the issue in this case is not whether, and under what circumstances, a juvenile court has authority under ORS 419B.387 to order a parent to participate in a psychological evaluation. We resolved those issues in *D. R. D.* Instead, this case presents the narrow question of the proper application of ORS 419B.387 to the facts presented here.

Before turning to the facts of the instant case, however, it is helpful to frame our analysis by first discussing our decisions in *D. R. D.* and *T. L. H.*

In *D. R. D.*, the father appealed a juvenile court judgment that required him to participate in a psychological evaluation. 298 Or App at 790. Evidence adduced in the juvenile court in *D. R. D.* reflected that the father had a history of drug use; had recently used methamphetamine; and had "not engaged in any service referrals" that the

---

[2] The state also argues that father's claim of error is unpreserved. We reject that argument without further discussion.

Department of Human Services (DHS) had made for him. *Id.* at 791-92, 795. At the evidentiary hearing, a DHS employee testified that she believed that a psychological evaluation would assist the father:

> "I believe that the psychological evaluation will give some insight as to why he is not engaging in substance abuse treatment so that we could get him the proper services, so that he can engage in treatment and remain clean and sober to be a parental resource for this child."

*Id.* at 793.

The father, for his part, testified that he had "no good excuse" for failing to engage in treatment. *Id.* at 794.

After hearing evidence, the juvenile court ordered the father to undertake a psychological evaluation. *Id.* at 795. It explained to father that:

> "I would really like you to do the psych eval because when you were here at the jurisdictional hearing, you said you wanted to raise this child, right? And I really want you to be able to do that, but you're not—it appears to me that you're not able to stay clean and sober on your own, so there might be some underlying reasons why you're not. I think it would help you."

*Id.*

The juvenile court then issued a judgment that included findings that the father "'continues to abuse methamphetamine' and that his participation in a 'psychological evaluation will help DHS determine what it can do to motivate father to engage and what services are best to help father maintain sobriety and develop a relationship with the child.'" *Id.* at 796.

On appeal, the father argued that "the juvenile court erred in ordering him to submit to a psychological evaluation because, although ORS 419B.387 allows for 'treatment or training,' the statute does not authorize the juvenile court to order parents to submit to a psychological evaluation that is invasive and potentially incriminatory by nature." *Id.* at 790. In response, DHS argued that, because the juvenile court has "specific authority under ORS 419B.387 to order a parent to participate in 'treatment or training,'" that

authority "must also necessarily include the ability to order assessments to determine the type and extent of the treatment or training that is needed to enable a parent to resume care of a child." *Id.*

After reviewing the statutory text, in context, we concluded, as noted above, that "ORS 419B.387 authorizes the juvenile court to order a parent to participate in treatment or training, but conditions that authority on a finding of need, following an evidentiary hearing," and that "a psychological evaluation—*as a component of treatment or training*—is authorized under ORS 419B.387." *Id.* at 790, 799 (emphasis in original).

Applying that standard to the facts of the case, we concluded that the juvenile court did not err. We explained:

"Ultimately, the juvenile court ordered father to participate in a psychological evaluation to be set up by DHS, finding that father was 'not able to stay clean and sober' and, so, his participation in a 'psychological evaluation will help DHS determine what it can do to motivate father to engage *** and develop a relationship with the child.' It is clear on this record that the juvenile court found that DHS had presented evidence to establish a need for substance abuse treatment and that the psychological evaluation was a component of that needed treatment. The juvenile court's findings are supported by evidence in the record that establishes that father needed such treatment or training in order to resume care of his child, as set out in ORS 419B.387. Thus, the juvenile court was within its authority, as provided in ORS 419B.387, when it made that order."

*Id.* at 800 (omission in original).

After our decision in *D. R. D.*, we decided *T. L. H.* In that case, DHS filed a motion requesting that the juvenile court order the father to undertake a psychological evaluation. *T. L. H.*, 300 Or App at 609. DHS's motion noted that the father's child has high "behavioral needs" and that the evaluation would "assess the father's ability to maintain a stable residence while trying to parent a child whose needs are as high as this child's needs." *Id.* In DHS's motion, DHS highlighted that the father had only recently started

engaging in services addressing his ability to maintain a stable and safe residence for the child. *Id.* DHS argued that it needed "to ensure that [the father] has all services that he needs in order to parent his son for an extended period of time." *Id.*

In support of its motion, DHS submitted an affidavit, in which a caseworker averred that the psychological evaluation was "necessary to determine whether the father will be able to meet the high needs of the child and, if so, what services may be necessary to help him meet the child's high needs." *Id.*

During an evidentiary hearing on DHS's motion, the caseworker testified that she had "concerns about father's ability to be 'proactive' and 'planful' with respect to ensuring his son's treatment"; "she was unsure that the child would make it to his appointments consistently"; and she had "received information bringing her to question father's ability to understand and participate in his child's treatment appointments," *i.e.,* "when father did attend appointments, he was 'either not in the appointment with [his child] the entire time or not fully engaged or coming in and out of the appointments,' and he 'appeared scattered.'" *Id.* at 610-11. She also testified that, "without a proper psychological evaluation, she would be unable to assess father's ability to process specialized information." *Id.* at 611.

The caseworker further testified that she supported a psychological evaluation for the following reasons:

> "I think from the agency's perspective, this child is extremely high needs and would be a lot for any parent to handle.

> "He has needs that I personally see, not that other kids in care have not exhibited, that are pretty rare and that we've had even a hard time finding specialists who know how to handle these issues.

> "And so just knowing that, I would want the psychological evaluation to be able to tell the agency if [father] is able to understand and meet those needs that are rare and ever present in his daily life."

*Id.*

At the conclusion of the hearing, the juvenile court granted DHS's motion and ordered the father to undertake a psychological evaluation. *Id.* at 612. The court found that "it is in the child's best interest that [the father] participate in a psychological evaluation," and told the father, "Bottom line is a high-risk kid needs more than 50 percent of your time for doctor appointments. So, you have come a long way, but you got started late." *Id.*

On appeal, we affirmed the juvenile court's order, concluding that the juvenile court did not exceed its authority under ORS 419B.387. *Id.* at 615. We determined that the "record contains evidence to establish a need for treatment or training to meet the needs[] and resume the care[] of the child and that the psychological evaluation was a component of that needed treatment or training." *Id.* at 616.

We explained that the evidence "showed that father's child had extraordinarily high needs and addressing those needs and resuming care would require exceptional parental skills." *Id.* at 615. Given the child's high needs,

"the [juvenile] court permissibly determined that treatment or training was needed to prepare father to resume care of the child, especially in view of the evidence of father's impediments to parenting."

*Id.* at 615-16.

We also observed that there was evidence that, "at the time of the hearing, father continued to struggle to maintain residential stability, had difficulty consistently attending and participating effectively in his son's appointments, and was suffering from PTSD," and that "a psychological evaluation was necessary to get a fuller picture of father's circumstances in order to determine how to prepare father to meet his child's needs." *Id.* at 616. We noted the caseworker's testimony that "the evaluation would help assess father's ability to plan, be proactive, understand specialized information, and meet his child's needs," and that an evaluation was "'necessary to determine whether the father will be able to meet the high needs of the child and, if so, what services may be necessary to help him meet the child's high needs.'" *Id.*

With the analysis that we undertook in *D. R. D.* and *T. L. H.* and our standard of review in mind, we turn to the facts of the instant case.

On December 5, 2019, within two days of R's birth, DHS filed a dependency petition making certain allegations regarding mother and father. With regard to father, among such allegations, was that father had "a history of assaultive behavior that places the child at risk of harm" and that "father does not understand the basic needs of the child and lacks parenting skills necessary to safely parent." DHS also requested a shelter-care hearing.

During the shelter-care hearing—which also occurred on December 5, 2019—after considering R's health and safety, and whether the provision of reasonable services could prevent or eliminate the need to separate the family, the juvenile court found that R could not "be safely returned home or maintained in the home without further danger of suffering physical or emotional harm." Findings of fact attached to the order from the shelter-care hearing reflect that hospital staff reported that father, after R's birth, was "not responding" to R's cues and needed prompting to feed R. Those findings also reflect that father has substance abuse issues that had not been addressed and "a history of assaultive behavior."

A protective custody report filed by DHS and received into evidence on December 5, 2019, reflects that father had an unlawful possession of methamphetamine charge from January 17, 2018, and that in March 2019 he was revoked from probation for testing positive for methamphetamine, failing to report to his probation officer as required, and that his engagement in required treatment was minimal. Additionally, it states that father had a "notable criminal history related to assault, strangulation, and harassment." It also reflects that father had stated to DHS his intent "to engage services and have his son returned."

On January 14, 2020, the juvenile court held a hearing on the dependency petition, and after mother admitted to certain allegations pertaining to her, the juvenile court

issued a judgment finding R within the jurisdiction of the juvenile court, making R a ward of the court, and placing R in the temporary custody of DHS.

On March 2, 2020, DHS filed an amended dependency petition regarding R, which amended some of the allegations as to father, including the allegation concerning father's "history of assaultive behavior." DHS amended that allegation to instead provide that "father has a history of assaultive behavior and lacks anger control, which places the child at threat of harm."

A subsequent hearing was scheduled for June 16, 2020, and on June 16, 2020, DHS filed a report for that hearing, which was offered as an exhibit and received by the court.

DHS's June 16, 2020, report reflects that, on May 27, 2020—notwithstanding that, at that point, R had been removed from father's care for nearly six months, and that, at that point, father was aware of DHS's concerns regarding father's "history of assaultive behavior" and lack of "anger control"—father engaged in conduct *vis-à-vis* mother constituting assault and menacing; that father was arrested for that conduct (which DHS referred to as "strangulation") on May 30, 2020; and that father subsequently pleaded guilty to "Assault IV-DV and menacing-DV" for "intentionally caus[ing] physical injury" to mother and "intentionally attempt[ing] to place [mother] in fear of imminent physical injury." Additionally, the report filed by DHS reflects that, during the six months when R was out of his care, father had "confronted" the "house manager" at his residence in an aggressive manner, asking what the house manager had "told DHS."

DHS's June 16, 2020, report also reflects that, in the six months between the December 5, 2019, shelter-care hearing and the June 16, 2020, hearing, DHS had worked with father in numerous ways: DHS referred father to a parent mentor and a "baby group"; provided father visitation services; and referred father to an addiction recovery team due to substance abuse concerns. DHS also facilitated

paternity testing for father and R; drug testing for father; and DHS was preparing to provide rental assistance to father at the sober living facility at which father was residing, because father had requested that DHS provide such rental assistance. DHS also offered in-home safety and reunification services to father, although father declined them.

Further, to father's credit, DHS's June 16, 2020, report reflects that, during the six months between the December 5, 2019, shelter-care hearing and the June 16, 2020, hearing, father had maintained regular visitation with R, even when some such visits needed to be virtual due to COVID-19; father told DHS that he wanted R to be with him, and not mother, because father did not believe mother was a safe parent and believed mother to be using drugs; father engaged with the addiction recovery team and participated in urinalysis testing; and father inquired of DHS what services it could provide to father. Father also told DHS that he would stipulate in court to "whatever he needed to do."

Additionally, for the June 16, 2020, hearing, DHS filed an "action agreement," which recommended, among other steps, that father "participate in comprehensive psychological evaluation" to "aid in determining the [father's] ongoing needs," and noted that, following the evaluation, the evaluation would be reviewed by a DHS caseworker, who would then refer father to necessary services.

At the June 16, 2020, hearing, father admitted to two bases for jurisdiction: first, that father "needs the assistance of the agency to facilitate a relationship with the child and access parenting services, without which the child would be at a threat of harm"; and, second, that father had "pled guilty to charges of assault and menacing that constitute domestic violence and his behaviors place the child at threat of harm." In his admission, father also acknowledged that the Adoption and Safe Families Act "time lines require the court to obtain permanency for the child in one year." The juvenile court also explained to father that "the rules require that the Court obtain permanency for [a] child in one

year," and, therefore, father "probably need[s] to not dilly-dally, *** in participating in services."[3]

During the June 16, 2020, hearing, a DHS case-worker, Terry, testified as to why she believed a psychological evaluation was necessary for father:

> "For the father, obviously, we have concerns about domestic violence, but also about general aggressivity and impulsivity that has been noted in many different aspects of his life.
>
> "So, DHS, while we certainly want to address the domestic violence aspect, we also see this ongoing pattern of assaultive behavior and impulsive behavior, and we would like to understand what is underlying those behaviors in order to provide the best services possible to father.
>
> "Oh, and, Your Honor, I apologize. The father does have other children who are out of his care. We don't—we would also like to—given that fact, we think that that also goes to show the importance of the psychological evaluation to determine the services that can allow him to be successful in parenting [R]."

At the end of the hearing, the juvenile court ordered the psychological evaluation, as requested by DHS, and told father that it was not "punitive" and that it "could be that they don't come up with any treatment recommendations" for him, but that, "if they come up with treatment recommendations," the court "would suggest" that father follow those. The juvenile court also determined that DHS had made reasonable efforts to prevent or eliminate the need for removal of R, and that, since R's removal, DHS had made reasonable efforts to make it possible for R to return home safely. Because R had not been returned home, those efforts had, apparently, not been successful.

The juvenile court then issued a judgment of jurisdiction and disposition, which father appeals.

---

[3]  We understand the juvenile court to have been referencing ORS 419B.470(2), which provides, in pertinent part, that, "when a child or ward is in substitute care, the court shall conduct a permanency hearing no later than 12 months after the ward was found within the jurisdiction of the court under ORS 419B.100 or 14 months after the child or ward was placed in substitute care, whichever is the earlier."

Having considered the parties' arguments, we conclude that the record in this case contains legally sufficient evidence for the juvenile court to have determined that a psychological evaluation was a component of the treatment or training needed by father to prepare father to resume care of R.

Terry testified that DHS had "concerns about domestic violence" and also about the "general aggressivity and impulsivity that has been noted in many different aspects of" father's life. Terry further testified that DHS wanted to address father's "ongoing pattern of assaultive behavior and impulsive behavior," but that, to do so, DHS needed to "understand what is underlying those behaviors" so that it could "provide the best services possible to father."

That is, there was evidence of a need for treatment and training to address father's pattern of assaultive and impulsive behavior—a pattern reflected in father's assault and menacing of R's mother, which father admitted placed R "at threat of harm," and that father engaged in even after he was aware that his assaultive and impulsive conduct was one of DHS's safety concerns regarding father's ability to safely parent R—and a psychological evaluation was a component of that treatment or training. *See D. R. D.*, 298 Or App at 800 (affirming order of psychological evaluation where it was "clear on this record that the juvenile court found that DHS had presented evidence to establish a need for substance abuse treatment and that the psychological evaluation was a component of that needed treatment"); *T. L. H.*, 300 Or App at 616 (juvenile court did not err in ordering a psychological evaluation where there was evidence that "a psychological evaluation was necessary to get a fuller picture of father's circumstances in order to determine how to prepare father to meet his child's needs"). Thus, the psychological evaluation was not ordered to determine *if* there was a need for treatment or training to prepare father to resume care of R; rather, a need for treatment or training was established at the hearing, and a psychological evaluation was simply a component of that treatment or training. In other words, the juvenile court made the necessary predicate determination before ordering the psychological

evaluation—it correctly had the horse before the cart, not the cart before the horse.

Although it is unclear in this case what the psychological evaluation will reveal, that was similarly true in *D. R. D.* and *T. L. H.*, and that does not transform the psychological evaluation into a "discovery mechanism to determine *if* there is a need for treatment or training." *D. R. D.*, 298 Or App at 799 (emphasis in original). Nor does the juvenile court's acknowledgement that it "could be" that the psychological evaluation does not "come up" with any treatment recommendation transform the psychological evaluation "into a discovery mechanism to determine *if* there is a need for treatment or training." *Id.* (emphasis in original); *see id.* at 795, 800 (affirming order of psychological evaluation where juvenile court stated that "there *might be* some underlying reasons why" father was not able to stay clean and sober and told father "*I think* [a psychological evaluation] would help you" (emphases added)).

Given the record in this case, we conclude that the juvenile court was permitted to determine that treatment or training was necessary and that, as in *D. R. D.* and *T. L. H.*, a psychological evaluation would enable DHS to tailor that necessary treatment and training to father's particular needs.

We emphasize that ORS 419B.387 does not authorize a psychological evaluation every time a parent has a problem and such an evaluation could reveal merely useful treatment and training. In this case, however, R had been out of his parents' care for over six months, essentially since his birth, and the efforts previously undertaken by DHS to enable R's safe return home had not worked. To the contrary, even while R was in the custody of DHS, father's "ongoing pattern of assaultive behavior and impulsive behavior" evinced itself via an assault on R's mother. Oregon's dependency statutes "evince[] the specific policy objective that children not be left indefinitely in a placement limbo," *Dept. of Human Services v. M. H.*, 266 Or App 361, 365, 337 P3d 976 (2014) (so noting with regard to ORS 419B.470), and the record supports a determination that father had behavioral issues that he needed to address to resume care of R. As in

*D. R. D.* and *T. L. H.*, it was not error for the juvenile court to order a psychological evaluation as a component of the treatment or training needed by father to prepare father to resume care of his child.[4]

Affirmed.

**AOYAGI, J.,** dissenting.

I agree with the majority's description of the existing law regarding orders for parental psychological evaluations under ORS 419B.387. However, I disagree with its application of that law, which, in my view, effectively overrules our recent decision in *Dept. of Human Services v. D. R. D.*, 298 Or App 788, 450 P3d 1022 (2019). Under the majority's analysis, the juvenile court *will* be able to order

---

[4] According to the dissent, the psychological evaluation in this case was ordered "at the very start of the case (the literal day that jurisdiction is taken), before baseline services keyed to the established jurisdictional bases ha[d] even been ordered." 312 Or App at 492 (Aoyagi, J., dissenting).

This case—Washington County Case No. 19JU08898—was filed on December 5, 2019, the day DHS requested a shelter-care hearing for R and filed a dependency petition making allegations regarding mother and father. By the time of the June 16, 2020, hearing at which father admitted to jurisdictional bases and the juvenile court ordered father to participate in a psychological evaluation, R, who had come into care when he was only a few days old, had been out of his parents' care for *over six months* (since December 5, 2019), and as reflected in this opinion, much had transpired during that time: Among other events, DHS offered father services, father participated in services, father visited R regularly and expressed his desire for R to be with him as opposed to mother, and father engaged in conduct with regard to mother constituting assault and menacing. Thus, in our view, contrary to the dissent's view, the psychological evaluation in this case was not ordered "at the very start of the case." 312 Or App at 492 (Aoyagi, J., dissenting). That would be a very different case than this case.

The dissent is correct, however, that the psychological evaluation in this case was ordered by the court on the day father admitted to the allegations in the then-operative dependency petition, and that father was ordered to participate in the psychological evaluation before father had the opportunity to participate in any court-ordered services. *See* 312 Or App at 492 (Aoyagi, J., dissenting). But neither *D. R. D.* nor *T. L. H.* announced a rule that a psychological evaluation cannot be ordered by the court under ORS 419B.387 as a component of necessary treatment or training on the day a parent admits to the allegations in a dependency petition. Such a rule seems counterintuitive, especially if consideration is given to what may have transpired prior to such admission and to the evidence presented at the evidentiary hearing. Nor is such a rule supported by the text or context of ORS 419B.387. Thus, contrary to the dissent's assertion, this opinion does not "effectively overrule" *D. R. D.* 312 Or App at 487 (Aoyagi, J., dissenting). We believe the dissent's analysis, however, if accepted, would impose a new limitation on when a court can order a psychological evaluation; a limitation that does not appear anywhere in the text of ORS 419B.387, or in *D. R. D.* or *T. L. H.*

a psychological evaluation of one or both parents in virtually every dependency case, notwithstanding the majority's claims otherwise. Because that result is inconsistent with the statute, as we construed it only a little over a year ago in *D. R. D.*, I respectfully dissent.

The facts of this case are adequately described in the majority opinion. The most salient are these. The juvenile court ordered father to submit to a psychological evaluation on the same day that it took dependency jurisdiction over R, a six-month-old infant. Father stipulated to jurisdiction based on his need for DHS assistance to facilitate a relationship with R and to access parenting services, as well as based on his having engaged in domestic-violence behaviors that placed R at threat of harm. To address those issues, the juvenile court ordered father to participate in specific types of training and treatment, specifically parenting support services, in-home safety and reunification services, and domestic-violence services for perpetrators. Additionally, the court ordered father to submit to a psychological evaluation to determine more precisely his service needs. Father objected to the latter, arguing that such an order was not supported by the record or, at the very least, was premature when no services had been ordered yet. The court nonetheless ordered the evaluation, acknowledging that it might not result in any treatment recommendations.

The juvenile court's statutory authority to order a parent to submit to a psychological evaluation is a question of law. *See D. R. D.*, 298 Or App at 791. In this case, the statute at issue is ORS 419B.387, which provides:

> "If the court finds in an evidentiary hearing that treatment or training is needed by a parent to correct the circumstances that resulted in wardship or to prepare the parent to resume the care of the ward, the court may order the parent to participate in the treatment or training if the participation is in the ward's best interests."

In *D. R. D.*, we explained that ORS 419B.387 authorizes the juvenile court to order a parent to participate in treatment or training found to be needed by the parent after an evidentiary hearing—including ordering the parent to submit to a psychological evaluation *"as a component"* of the

needed treatment or training—but that it "does not imbue the juvenile court with authority to order a parent to comply with a discovery mechanism to determine *if* there is a need for treatment or training." 298 Or App at 799 (emphases in original). "Rather, as the statute sets forth, it is the establishment of a need for treatment or training at the evidentiary hearing that then creates the court's authority to order a parent to comply with that treatment or training." *Id.* at 799-800.

I cannot reconcile the majority's disposition of this case with the statutory limitation on juvenile court authority described in *D. R. D.* DHS went into the initial jurisdictional hearing in this case wanting a "comprehensive psychological evaluation" of father to "aid in determining [his] ongoing needs" so as to assist the DHS caseworker in referring him to services. When father objected to such an order, DHS called a caseworker to testify, who explained that DHS had "concerns about domestic violence" and "general aggressivity and impulsivity that has been noted in many different aspects of his life" and that it "would like to understand what is underlying those behaviors in order to provide the best services possible to father." DHS also noted that father had "other children out of his care," which it said "show[ed] the importance of a psychological evaluation to determine the services that can allow him to be successful in parenting." The juvenile court subsequently ordered a psychological evaluation, acknowledging that it "could be that they don't come up with any treatment recommendations."

Thus, the juvenile court ordered a psychological evaluation either (1) to assist DHS in finetuning its referrals for services that the court was already ordering, such as domestic-violence services, so that DHS could provide the "best services possible," or (2) to determine if additional types of services should be provided. Either way, the court exceeded its authority under ORS 419B.387 as construed in *D. R. D.*

The majority appears to view the psychological evaluation as a "component" of the domestic-violence treatment in which the juvenile court ordered father to participate. 312 Or App at 486. Not because it is a component of the actual

treatment program (which had not yet been identified), and not because father had demonstrated a psychological impediment to successfully engaging in that program (he had not), but simply because the majority says that it is. *See* 312 Or App at 485-86.

In *D. R. D.*, we affirmed a juvenile court order requiring a father to submit to a psychological evaluation, where the father had failed to engage in court-ordered drug treatment services during the 60 days after dependency jurisdiction was taken, admitted to having "no good excuse" for not engaging in services, and had continued to use methamphetamine, despite his desire to regain custody of the child, such that a psychological evaluation had become necessary as a component of his court-ordered drug treatment. 298 Or App at 792, 794-95, 800. In *Dept. of Human Services v. T. L. H.*, 300 Or App 606, 615-16, 453 P3d 556 (2019), we affirmed a juvenile court order requiring a father to submit to a psychological evaluation where the dependency case had been ongoing for 18 months, the child had "extraordinarily high needs" that required "exceptional parental skills," and the father (who had PTSD) had been slow to engage in services and had failed to consistently attend and engage in the child's doctor's appointments, despite wanting to regain custody, such that a psychological evaluation had become necessary as a component of the father's ongoing treatment and training.

No such situation exists here. Father was ordered to submit to a psychological evaluation on the *very day* that the juvenile court took jurisdiction of R. Father had not been ordered to engage in any services at that point, let alone failed to engage in them under circumstances suggesting a psychological impediment.

The majority sweeps aside that fact as irrelevant, asserting that the legal standard identified in *D .R. D.* was met because "the psychological evaluation was not ordered to determine *if* there was a need for treatment or training," but, "rather, a need for treatment or training was established at the hearing," and so the juvenile court made the necessary "predicate determination" to order a psychological evaluation. 312 Or App at 485-86 (emphasis in original).

But if the only "predicate" to ordering a psychological evaluation is a finding that a parent needs treatment of some kind (any kind), then that is no predicate at all. It is difficult to conceive of any case in which the juvenile court could take dependency jurisdiction of a child without finding that the parents need *some* kind of treatment or training. The logic of the majority opinion leads to the inexorable conclusion that, upon entering a dependency judgment, the juvenile court will always have the authority to simply declare a psychological evaluation a "component" of whatever treatment or training it has ordered. That is not my understanding of *D. R. D.*

Anytime a juvenile court asserts dependency jurisdiction over a child, the court will necessarily have determined that the child's parents are not functioning as minimally adequate parents. *See Dept. of Human Services v. S. W.*, 267 Or App 277, 286, 340 P3d 675 (2014) (the goal for reunification is for the child's parents to "become minimally adequate parents"). Every parent whose child is made a ward of the court necessarily has been found to have one or more significant problems that put the child at serious risk—whether it be domestic violence, substance abuse, lack of parenting skills, inadequate supervision, residential instability, custodial unavailability, or any number of issues—and those problems often have a long history. In other words, every jurisdictional basis necessarily reflects a problem that a parent needs to address, typically through treatment or training, to become a minimally adequate parent so that the child may return home. If ORS 419B.387 authorizes ordering a psychological evaluation every time that a parent has a problem, because it could help DHS to finetune its referrals for services that the court has already ordered, then there is really no limit on ordering such evaluations.

As for the possibility that the juvenile court ordered the psychological evaluation as a way to identify types of treatment or training that might be needed and not already ordered—a possibility that I cannot exclude on this record—that would be even more directly contrary to *D. R. D.*'s admonition that the juvenile court lacks authority under

ORS 419B.387 to order a parent to submit to a psychological evaluation as a "discovery mechanism to determine *if* there is a need for treatment or training." 298 Or App at 799 (emphasis in original). For example, if the court ordered father to submit to a psychological evaluation as a means to investigate whether he might benefit from substance abuse or mental health treatment, that would be purely a discovery mechanism.

The juvenile court's order in this case does exactly what *D. R. D.* precludes: It requires father to submit to a psychological evaluation to help the court and DHS determine father's precise treatment needs, at the very start of the case (the literal day that jurisdiction is taken), before baseline services keyed to the established jurisdictional bases have even been ordered. In affirming that order, the majority maintains that the juvenile court did not do what it seems plain to me on this record that it did—order a psychological evaluation as a discovery mechanism to determine what services father needs—and that the majority opinion itself is not doing what it seems plain to me that it is— reading the distinction articulated in *D. R. D.* out of existence while claiming to apply it, and adopting an approach that will have the practical effect of allowing a parental psychological evaluation to be ordered in virtually any case.

I am also troubled by the majority's reliance on the fact that R was in shelter care for six months before dependency jurisdiction was taken as justifying ordering a psychological evaluation as soon as jurisdiction was taken. The majority asserts that R's time in shelter care makes this case "very different" from one in which a psychological evaluation is ordered at "the very start of the case." 312 Or App at 487 n 4. That is a remarkable position for several reasons.

First, DHS has never argued—in the trial court or on appeal—that father's conduct during the six months before the jurisdictional hearing evidenced the need for a psychological evaluation. That was not the basis for DHS's request or for the juvenile court's order. Second, in any event, the majority is not saying that father demonstrated a psychological impediment to successful engagement in treatment during the six months before jurisdiction was taken.

Rather, it is relying on the mere passage of time itself, without resolution of the alleged jurisdictional bases, as authorizing the juvenile court to order a psychological evaluation on day one of taking jurisdiction. *See id.* Even if one considers the shelter-order period, nothing in this record allows a reasonable inference that father has a psychological impediment to succeeding in court-ordered treatment, such that a psychological evaluation is a necessary component of the treatment, akin to the situations in *D. R. D.* and *T. L. H.* Third, we have previously recognized that a parent has no obligation to engage in services before jurisdiction is taken. *See Dept. of Human Services v. J. E. R.*, 293 Or App 387, 395, 429 P3d 420 (2018). There is significant tension between our saying that a parent is not required to engage in services until jurisdiction is taken (and services are ordered) and our saying that a parent who fails to ameliorate alleged jurisdictional bases before jurisdiction is taken needs a psychological evaluation. Finally, shelter orders are not unusual in dependency cases, there is always some delay in holding a dependency jurisdictional hearing, and any child at any age can be said to need permanency as soon as possible. This case is hardly unique.

For those reasons, I dissent. *D. R. D.* recognized a critical limitation on the juvenile court's authority to order a parent to submit to a psychological evaluation in a dependency case, and the majority's decision in this case effectively does away with that limitation, despite its assertions to the contrary. Any competent attorney will be able to frame DHS's request in a manner that meets the extraordinarily low bar set in this case. Thus, the practical effect of the decision is to eliminate the statutory limitation on juvenile court authority recognized in *D. R. D.* That is wrong in my view—because it misconstrues the statute, because it fails to give effect to the limitation articulated in our own recent precedent, and because it leads to the wrong result in this case.

It is important to remember that the issue is not whether a parent will be offered a psychological evaluation but whether a parent will be ordered to submit to one. On this record, I agree with father that the juvenile court

exceeded its authority under ORS 419B.387 when it ordered him to submit to a psychological evaluation in the initial dependency judgment, and I would reverse that portion of the judgment. Accordingly, I respectfully dissent.

Ortega, Lagesen, DeHoog, James, and Mooney, JJ., join in this dissent.